**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **Jerry North,** | * | **CASE NO:** |
| **Plaintiff,** | * | **JUDGE:** |
| **vs.** | * | |
| **Village of West Milton,** | * | **COMPLAINT WITH JURY** |
| 701 S. Miami Street, West Milton, Ohio 45383 | * | **DEMAND** |
| **Doyle Wright,** | * | |
| C/O West Milton Police Department | | |
| 701 S. Miami Street, West Milton, Ohio 45383 | * | |
| **James Leonard,** | * | |
| C/O West Milton Police Department | | |
| 701 S. Miami Street, West Milton, Ohio 45383 | * | |
| **Jason Stevens,** | * | |
| C/O West Milton Police Department | | |
| 701 S. Miami Street, West Milton, Ohio 45383 | * | |
| **Angela Brewer,** | * | |
| 7277 South Jay Road, West Milton, Ohio 45383 | * | |
| **Michael Brewer,** | * | |
| C/O Riverside Police Dept- | | |
| 1791 Harshman Road, Dayton, Ohio 45424 | * | |
| **Jennifer Knisley,** | * | |
| c/o Isaiah's Place | | |
| 1100 Wayne Street | * | |
| Suite 340 | | |
| Troy, Ohio 45373 | | |
| **Defendants.** | | |

Now comes Plaintiff, through counsel, and sets for his complaint for damages:

## Preliminary Statement

This is a civil rights action brought pursuant to 42 U.S.C. §1983 and accompanied by supplemental state claims. This action arises out of the conduct of Defendant police officers and those acting as agents of the West Milton Ohio Police Department and the Village of West Milton Ohio, as well as the parents of a child accuser who fabricated allegations that the Plaintiff had sexually assaulted him. The Defendants, with knowledge that they lacked evidence sufficient to arrest, unlawfully arrested, incarcerated, maliciously prosecuted, and defamed Plaintiff. The Defendants conspired to do these acts in the hope that the media attention from the Plaintiff's arrest and public humiliation would be enough to prompt witnesses to come forward and provide support for the baseless charges. When no evidence materialized, the police officers falsified information in the official report to make it appear that it had. This is an unlawful misuse of police power and has harmed Plaintiff physically, emotionally and financially.

## Jurisdiction

1. This Court has Jurisdiction of the subject matter of this complaint pursuant to 42 U.S.C. §1983 and 28 U.S.C. §§ 1331, 1343(a), and 1367(a).

## The Parties

2. Plaintiff, Jerry North is a resident of Miami County, Ohio and was a custodian with the West Milton School District until the actions of Defendants caused him to be unlawfully arrested.

3. Defendant, the Village of West Milton is a political subdivision and municipality of the State of Ohio. At all times mentioned herein, the officers of the West Milton Police Department acted according to the policies maintained by the Village of West Milton and its customs and according to the training provided to them at the Village's direction. At all times referenced herein, the Village of West Milton and its officers and agents acted under color of state law.

4. Defendant Doyle Wright is the Chief of Police of the Village of West Milton's Police department and the chief law enforcement officer and law enforcement policy-maker for the City of West Milton. At all times referenced herein, the Defendant police officers and agents of the Village of West Milton acted according to the policies maintained by Defendant Wright and according to the training provided to them under Defendant Wright's direction. At all times referenced herein, Defendant Wright acted under color of state law. He is sued in his official and personal capacity.

5. Defendant James Leonard is a police officer with the City of West Milton. Defendant Leonard is sued in his personal capacity. At all times referenced herein, Defendant Leonard acted under color of state law.

6. Defendant Jason Stevens is a police officer with the City of West Milton. Defendant Stevens is sued in his personal capacity. At all times referenced herein, Defendant Stevens acted under color of state law.

7. Defenant Angela Brewer is the mother of a West Milton juvenile student, (B.B.), who accused Plaintiff of sexual assault.

8. Defendant Michael Brewer is a police officer with the Riverside Police Department in Riverside Ohio and the father of the accuser. Mr. Brewer was married to Defendant Angela Brewer during the times set forth in this complaint. Mr. Brewer went to high school and played sports with Defendant Leonard.

9. Defendant Jennifer Knisley is a social worker and the program director for Isaiah's Place, a faith-based, non-profit located in Troy, OH. Defendant Knisley was acting as an agent of, and on behalf of, the West Milton Police Department at all times referenced herein. Knisley conducted interviews with the accuser and a student that the accuser claimed witnessed the assault(s). Defendant Knisley is sued in her personal capacity. At all times referenced herein Defendant Knisley acted under color of state law.

10. At all times referenced herein Defendants acted in concert and conspiracy and were jointly and severally responsible for the harm caused to Plaintiff.

11. At all times referenced herein Defendants' conduct was in willful, reckless and callous disregard of plaintiff's rights under federal and state law.

## Factual Allegations

12. The Defendants conspired to deprive Plaintiff of his liberty interests under the Fourth and Fourteenth Amendments to the United States Constitution.

13. The Defendants conspired to cause the arrest and initiate the malicious prosecution of the Plaintiff without probable cause.

14. Plaintiff was falsely arrested without probable cause and falsely imprisoned due to the wanton, willful and reckless acts of Defendants.

4

15. Plaintiff, Jerry North, was arrested on May 2nd, 2023 alleged to have raped and sexually assaulted B.B. the eleven-year-old accuser, who claimed the events occurred two years prior and over the course of three years.

16. The accuser recanted the allegations days before Plaintiff 's criminal trial was set to begin, stating that he had fabricated the story.

17. On January 22th, 2024, the Miami County Common Pleas Court dismissed the indicted charges with prejudice after motion of the County Prosecutor's office.

18. At the time the Defendants requested charges be filed in order to arrest Plaintiff they did not have probable cause that Plaintiff had committed a crime.

19. The mere allegation of a child, absent any corroborating evidence, in and of itself is not probable cause.

20. The Defendants not only lacked any evidence corroborating the accuser's statement, they possessed evidence that no crime had occurred. Prior to seeking charges, Police had interviewed the only direct witness that the accuser identified. That witness told them, and provided information that, the events did not and could not have occurred.

21. Prior to arresting Plaintiff, Defendants Leonard, Wright and Stevens, failed to speak to any witnesses other than the accuser and the identified witness who contradicted the accuser's story.

22. Prior to arresting Plaintiff, Defendants Leonard, Wright and Stevens, willfully and intentionally failed to conduct any investigation to determine if any corroborating evidence supporting the allegations existed.

23. Prior to arresting Plaintiff, Defendants Leonard, Wright and Stevens, willfully and intentionally failed to investigate the exculpatory evidence they possessed and

willfully and intentionally mischaracterized and/or concealed said evidence when seeking charges against Plaintiff from the county prosecuting attorney.

24. Prior to arresting Plaintiff, Defendants Leonard, Wright and Stevens, willfully and intentionally fabricated incriminating evidence against Plaintiff in pursuit of their plan to arrest Plaintiff.

25. Defendant Knisley, acting on behalf of the West Milton Police Department, conducted a "forensic" interview with the accuser that wholly failed to follow any recognized protocols for such interviews and instead she supported the truthfulness of the accuser's statement in her recommendations to the West Milton Police, despite the specifics of the statement being obvious and fantastical nonsense.

26. During Knisley's interview with the one eye witness alleged by the accuser to have been present at the assaults, Knisley, when faced with substantial factual contradictions of the accuser's story, resorted to manipulative and inappropriate questioning techniques to try to get the child to change their story so that it was not inconsistent with the accuser's claims.

27. Defendants Leonard, Wright and Stevens, in order to facilitate the arrest and prosecution of Plaintiff, created an investigative report containing intentional errors, omissions, mischaracterizations and falsehoods and presented it to the Miami County Prosecutor in their effort to secure charges against Plaintiff.

28. Defendants Leonard, Wright and Stevens, were aware the prosecutor would rely on the information they provided in determining whether to approve the arrest of Plaintiff.

29. Defendants Leonard, Wright and Stevens, were aware they did not have evidence sufficient to establish probable cause to arrest Plaintiff at the time they presented their report to the prosecutor.

30. The investigative report Defendants Leonard, Wright and Stevens, presented to the prosecutor omitted material facts.

31. The investigative report Defendants Leonard, Wright and Stevens, presented to the prosecutor minimized any information contrary to their theory that Plaintiff committed these crimes.

32. The investigative report Defendants Leonard, Wright and Stevens presented to the prosecutor contained numerous misrepresentations of evidence so as to appear as if they had inculpatory evidence that they did not possess.

33. The investigative report Defendants Leonard, Wright and Stevens, presented to the prosecutor fabricated evidence of Plaintiff 's guilt.

34. Defendant Leonard openly acknowledged the lack of probable cause but agreed to charge the Plaintiff anyway in order to see if other victims would come forward and strengthen the case against Plaintiff.  The other Defendants acted in concert, aid and/or agreement with this scheme.

35. No other accusers came forward, but Defendant Wright falsely misrepresented the interview of a witness in the investigative report which made it appear that one had potentially come forward.

36. Defendant Wright falsely misrepresented the interview of two other witness in the investigative report which made it appear that other individuals who had prior contact with the Plaintiff had expressed similar concerns about Plaintiff 's behavior.

37.  On April 23rd, 2023, the West Milton Police department received a call from Defendant Ashlie Brewer alleging her child was a victim of a sexual assault.

38.  The West Milton Police department dispatched Defendant Leonard to Brewer's home address on an alleged sexual assault.

39.  On April 23th, 2023, Defendant Leonard interviewed Defendant Ashlie Brewer at her home and her husband Defendant Michael Brewer, by telephone in the presence of Mrs. Brewer.

40.  The initial interview of the Brewers was recorded on Defendant Leonard's personal video and audio recording device also known as a "body cam."

41.  During the interview Mrs. Brewer told Leonard that her child told her that he had been inappropriately touched at school by Plaintiff in the school's restroom and that Plaintiff was luring students into the restroom with offers of candy.

42.  During the interview, Mrs. Brewer told Leonard that her child had reveled this at dinner the evening before, but she had told him that they could talk about it in the morning, as there were people around and she had been drinking.

43.  During the interview, Mrs. Brewer told Defendant Leonard she and her husband had been reporting allegations and concerns regarding Plaintiff to school authorities for years.

44.  During the interview, Mrs. Brewer told Defendant Leonard she and her husband asked the school's principal twice, as well as the school's superintendent to move the janitor's closet out of the boy's bathroom and keep Plaintiff away from their son.

45.  During the interview, Mrs. Brewer told Leonard school officials told her that her child could either use a bathroom on the other side of the school, or hold it until the child got home.

46. During the interview, Mrs. Brewer told Leonard that a teacher had made a report about Plaintiff to the school administration regarding Plaintiff inappropriately giving candy to students.

47. Most faculty and staff of the school gave out candy to the students.

48. Mrs. Brewer claimed that she found pockets full of candy in her son's clothing and that her son claimed that Plaintiff had given it to him.

49. A witness later stated that they had seen the Brewer's child taking candy from Plaintiff's work area when Plaintiff was not present.

50. During the interview, Mrs. Brewer told Leonard that when she reported this to the school districts' superintendent he pushed back, was very condescending and told her she was just "targeting homosexuals."

51. During the interview, Mrs. Brewer told Leonard that her husband made it very clear to the school officials that they did not want Plaintiff near the couple's child.

52. During the interview, the Brewers provided Leonard with the names of all school officials that they said they had complained to as well as teachers who had knowledge of the events.

53. During the interview, Leonard repeatedly stressed the importance of speaking to any witnesses as there would be no forensic evidence because the allegations were years old. Leonard expressed concern that it may come down to the witnesses' words against Plaintiff.

54. During the interview, Leonard acknowledged that there would not be enough evidence to charge Plaintiff if it was just the accuser's word against Plaintiff.

55. The details the Brewer's gave of their reporting to the school were easily verifiable.

56. The details the Brewers provided Leonard regarding their reporting to school officials were substantially false.

57. Neither Defendant Leonard nor any agent of the West Milton Police Department contacted or attempted to contact any individuals identified by the Brewers to verify the claims made by the Brewers.

58. Neither prior to Plaintiff's arrest, nor after it, did any agent of the West Milton Police department contact or attempt to contact any teachers who were identified by the accuser as being in the school during the times the incidents were said to have occurred.

59. During the interview, Mrs. Brewer told Leonard that there was another student who witnessed the events, stating that her child told her that the other student was "…with him the whole time."

60. Leonard would later inaccurately record this statement in the official investigative report, writing, that the witness was with the accuser "at least one time", after learning that the witness had contradicted the accuser's statement.

61. During the interview, Mrs. Brewer told Leonard her child and the student witness had been best friends and that the student's mother was a teacher in the school system her child attended.  Mrs. Brewer provided the names of the other student and his mother along with their contact information.

62. The police officers did not interview the witness's mother who would have advised them that their son was not allowed to associate with the accuser due to the accuser's numerous behavioral problems.

63. During the interview Leonard asked to call Mrs. Brewer's husband.

64. Before placing the call, Leonard advised that he knew Mr. Brewer well and that they had gone to high school together, played baseball, and were on the all-star-team together.

65. At the very beginning of Leonard's interview with Mrs. Brewer she advised that her husband was also a police officer.

66. While still in the presence of Mrs. Brewer, Leonard placed a call to Mr. Brewer.

67. The call was recorded and both Leonard and Mr. Brewer can be heard during the conversation.

68. During the call, Leonard reiterated his concern that because the incident was years ago there may not be enough evidence to charge Plaintiff with a crime.

69. During the call, Mr. Brewer acknowledged that without more evidence Plaintiff would likely not be charged, stating that it was like he told his wife "If it's just (the child's word), we know it's not going anywhere.'

70. During the call, Leonard stated to Mr. Brewer "So, basically what we're relying on, as you know as an investigator and all that, is the witnesses. So -- and it's going to be witnesses' words against his and that sort of thing. And maybe a bunch of people will start coming out, you know, once they start hearing about it", to which Mr. Brewer agreed.

71. During the call, Leonard noted the media attention Plaintiff's arrest would garner, stating that the "creep factor" with the case was very high.

72. During the call, Mr. Brewer expressed frustration that nothing could be done "criminally" or to the school for doing nothing.

73. During the pendency of the Plaintiff's criminal case, the Brewers demanded the school district pay them five million dollars. After the district did not respond to the

11

demand the Brewers filed a lawsuit against Plaintiff and the School District which they later voluntarily dismissed.

74. During the phone call, Leonard made it clear that, despite there not being enough evidence to arrest, if they did arrest Plaintiff it may result in other potential victims coming forward with additional information.  The Brewers agreed with Leonard's plan.

75. During the call, Leonard said to the Brewers "Once one person comes forward, it kind of becomes a snowball going down a hill. It becomes, you know, a huge -- it just gathers more and more momentum."   Then adding that "And even if that doesn't happen, at least there will be a report on file so if the next person comes forward... Where there's smoke there's fire you know."

76. During the call, Mr. Brewer and Leonard discussed, as police officers, how difficult it was to even get a prosecutor to approve charges with such little evidence.

77. Leonard and the Brewers agreed that the legal threshold for arrest in the case was too high.

78. During the call, Leonard stated "because you know that the threshold to actually get anything done, it's a horrible thing to think happened, and then you're like, man, the evidence that's required is so much. It's like -- before prosecutors even do anything, it's like you feel like you just are a piece of crap cop when you can't do anything with it, you know?" To which Mr. Brewer agreed stating "Right. But in reality, we all know what it is. We all -- you know, it's the way the law's written.", a statement with which Leonard also agreed.

79. Despite Leonard and the Brewers acknowledging the lack of evidence to charge Plaintiff, Leonard stated that "I have no problem at all running this as far as I can, so."

80.  Days later, Leonard would personally present the investigative reports to the prosecuting attorney and request Plaintiff be charged and arrested.

81.  During the call, Mr. Brewer asked Leonard if his home address and the name of the crime would be a part of the official report.  After confirming it would, Leonard assured Mr. Brewer that he could modify those details in the publicly accessible report and change it so that it would look like he was dispatched to the school on an assault, rather than the Brewers' home on a sexual assault.  The portion of Leonard's report made public makes those promised changes.

82.  Leonard declined to interview the accuser at that time.  He advised the Brewer's that he needed to check with chief Wright as to whether a "forensic interview" of the accuser was needed.  Leonard explained that he himself and his department had just received training on forensic interviews.

83.  The training Leonard was referring to was woefully inadequate and not in accordance with commonly accepted practices and/or the West Milton's Police Department's implementation of the training was ignored and/or inaccurately applied in the investigation of Plaintiff's case.

84.  The West Milton's Police Department has a history of inadequately handling child sexual assault cases.

85.  The following day, on April 24th, 2023 the accuser was interviewed by investigators.

86.  The accuser told Defendants that he would stay after school every few weeks for three years with his friend, A.K.  because A.K.'s mother worked as a school teacher.  The accuser alleged the assaults took place "pretty much" every time he stayed after with A.K.

87. The accuser alleged that he and A.K. had reported an attack by Plaintiff, to A.K.'s mother.

88. At no time did any agents of the West Milton Police Department ever question A.K.'s mother about the alleged reporting or how many times the accuser had stayed after school with her.

89. Had the Defendants questioned A.K.'s mother they would have learned that the allegations were false.

90. When A.K. was interviewed he told investigators that the accuser had stayed after school with him once maybe twice and the Plaintiff was out on medical leave when that occurred.

91. The Defendants did not question A.K.'s mother about the significant discrepancy in the number of times the accuser had stayed after school with A.K. Had they, they would have learned the accuser was fabricating the number of times and that the Plaintiff was not working at the school at that the time.

92. Defendant Wright went and got Plaintiff's employment records, which show Plaintiff had three separate extended medical leaves, but Wright did so only after Plaintiff's arrest.

93. The accuser claimed that the assaults lasted between five and twenty minutes.

94. Had the Defendant's interviewed A.K.'s mother they would have learned that the circumstances of the visit and her supervision would have made such claims impossible.

95. The accuser claimed that after each incident the Plaintiff went to the school's office and erased the video tapes showing himself exiting the restroom with Plaintiff. The accuser stated that he was one hundred percent sure that's what Plaintiff was doing

because he had personally observed Plaintiff being escorted out of the office by police since Plaintiff was not allowed to access that computer.

96.  The West Milton School is located inside the jurisdiction of the Defendants Leonard, Wright and Stevens' employer the West Milton Police Department.

97.  Defendants made no effort to check and see if, and or how many times, Plaintiff had to be escorted out of the school's office.

98.  Plaintiff had never been escorted out of the office and had no criminal history nor had he ever been arrested before these allegations.

99.  The Defendants did not interview the school's principal who could have told them that the school's security system was not located in that part of the building.

100.  During the interview the accuser provided the Defendants with the names of seven teachers who had been present in the school during the events in question.

101.  The witness A.K. told investigators that there were "tons" of people around at all times when the accuser stayed after school with him.

102.  The named teachers were never questioned by the Defendants.

103.  Had the Defendants inquired, they would have learned that half of the names provided by the accuser did not have classrooms in the part of the building the bathroom was located in and those teachers with adjacent classrooms would have easily been able to hear any such attacks as described by the accuser since the restroom has no doors.

104.  The restroom, with no doors, was located in a heavily trafficked area of the school near the office.  On any given day, during the times the accuser claimed the attacks occurred, there would have been a dozen or so adults in close proximity and within audible range of the bathroom.  A number of teachers indicated they could hear

15

children talking while using the rest room. The contrasting of that with the vicious attacks described by the accuser while he screamed out for help was never done because the police simply did not interview any teachers either before or even after they arrested plaintiff.

105. On April 24th, 2023, an interview was conducted with the accuser by Defendant Knisley.

106. The interview was conducted by Knisley at Isaiah's Place a faith-based non-profit at which Knisley holds the title of "program director."

107. Knisley regularly conducts child interviews on behalf of various police agencies as a part of criminal investigations.

108. Knisley's employer claims that it is a "[c]hild Advocacy Center [that] provides a coordinated response to allegations of child abuse in Miami County."

109. Knisley conducted the interview on behalf of, and in coordination with, the Defendants and the West Milton Police Department.

110. The Defendants written investigative report refer to the interview as a "forensic interview."

111. At all times herein, Knisley was working as an agent of the West Milton Police Department and under color of state law.

112. Defendant Stevens was present for the interview and authored the portion of investigative report provided to the prosecutor's office which directly dealt with this interview.

113. A forensic interview of a child sexual assault victim is an interview in a format designed to elicit the truth concerning sexual assault allegations in a manner that does not unduly influence the child. Its ultimate purpose is to get to the truth.

114.  There are a number of forensic interview format protocols identified and referenced by various investigative and psychological organizations including the Federal Bureau of Investigations.

115.  An individual conducting a forensic interview is expected to be versed and proficient in following the established protocols.

116.  Defendant Knisley purports to be trained in one or more of said protocols.

117.  During the interview of B.B., the accuser Knisley failed to follow accepted protocols for conducting a forensic interview.

118.  The culmination of Kinsley's failure to follow protocols encouraged B.B. to make outrageously exaggerated fabrications, that while obvious on their face, Kinsely reported to the other Defendants that the assertions were truthful.  Her recommendation was used to support arresting Plaintiff.

119.  Knisley had previously been involved in interviews on behalf of police investigators where a child fabricated details and Knisley then used the information to advise police to pursue legal action against an innocent criminal defendant.

120.  During the course of the forensic interview, the accuser began with an allegation concerning a single incident which had occurred of which he described as "inappropriate touching" allegedly done by Plaintiff.

121.  The accuser then explained to Knisley that after that incident Plaintiff never spoke to him again.  This appeared to go unnoticed by Knisley who pressed on asking to be told what else happened.

122.  During the interview, the story of what happened began getting larger and more detailed each time Knisley prompted the accuser to tell more, largely due to the manner

Knisley choose to conduct the questioning and her failure to follow established protocols.

123. During the interview, the accuser repeatedly contradicted himself over the number of times an assault had occurred, the time of day and the nature of the incidents and descriptions of what had happened.

124. At no time did Knisley confront the accuser over the contradictions or ask for any clarification.

125. During the interview, the accuser visibly appeared to be making the story up as he went along.

126. Despite numerous obvious fabrications Knisley failed to explore said statements and during one of the more obvious fabrications, Knisley actually deflected the accuser to a different subject, effectively having the accuser stop talking.

127. During the course of the interview the accuser described activities and allegations in the third person and in a manner which it appeared the accuser was describing something that had been seen, rather than had occurred to their own person.

128. During the course of the interview the accuser made various obvious fanciful statements that ran contrary to any individual's common sense as to how such activities occurred.

129. The accuser described each instance of physical assault, including forced anal rape at the age of six by Plaintiff, a two hundred and twenty pound six-foot-tall adult, as feeling "super soothing" and "relaxing."

130. During the course of the interview, Knisley would repeat questions previously asked and each time get more exaggerated responses and additional instances which were untethered to any previously provided time-line or details and that would

contradict the accuser's prior statements to the extent that Knisley would assess the claim, in her questioning, as a new incident, ignoring the fact that the discrepancies appeared as the direct result of her inappropriate questioning.

131.  Knisley advised the other Defendants the accuser was being truthful.

132.  Defendant Stevens recorded the interview in the investigative report in a manner which ignored the many obvious inconsistences and fabrications, instead witting that the details were such that they were very consistent with a series of sexual assaults.

133.  The day after the accuser was interviewed, Knisley conducted an interview with A.K. the witness identified by the accuser as being present when the attacks occurred, as well as being attacked himself.

134.  From the beginning of the interview A.K. told Knisley he had no memory of any incidents that the accuser had related.

135.  When Knisley asked A.K. how many time the accuser had stayed with him after school he replied, once maybe twice.  Despite this answer being strikingly different from what the accuser claimed, Knisley did not follow up and this would remain the last substantive question posed to A.K.

136.  Despite the accuser having said that A.K. was also attacked and that the two of them had reported the incident to A.K.'s mother, Knisley never bothered to ask A.K. about those incidents.

137.  Knisley repeatedly asked A.K. why he thought Plaintiff was "weird" after A.K. had made that statement early in the interview.  Over the course of the hour-long interview, Knisley focused on this and posed this question multiple times and it remained the focus of much of her questioning throughout.

138. On various occasions during the interview with A.K., Knisley would inaccurately restate A.K.'s prior answer, phrasing the answers in an incriminating manner against Plaintiff and asking A.K. to confirm. Knisley also repeated the same questions over and over acting as if she was displeased with, or did not believe A.K.'s, answers. Knisley also asked multiple convoluted questions that would have confused an adult, all in an attempt to get A.K. to say something consistent with the accuser's story and the Defendants' theory that a crime had been committed and Plaintiff had committed it.

139. To A.K.'s credit, given his age, he never wavered from the position that he did not witness any of the conduct the accuser claimed had occurred and he did not believe Plaintiff had done what the accuser claimed.

140. Repeating questions, asking confusing questions, rephrasing prior answers in a manner indicating either a disbelief in the original answer or as an attempt to gain confirmation of a fact not stated by a subject are all material violations of established protocols for forensic interviews. Such acts also evidence "confirmation bias" a prohibited error which occurs when the interviewer has already reached an opinion and employs tools to get a child to confirm their belief.

141. Many forensic interview protocols require that the interviewer have limited information so as to avoid confirmation bias.

142. Defendant Knisley had already expressed belief in the truth of B.B.'s fabrications when deciding to conduct A.K.'s interview.

143. At the conclusion of the A.K.'s interview, Knisley informed the other Defendants that A.K. was withholding information.

144.  The investigative report provided to the prosecutor intentionally minimizes and mischaracterizes the statements made by A.K. which were inconsistent with the Defendants' theory of Plaintiff 's culpability.

145.  The investigative report provided to the prosecutor lists objectively inaccurate observations, authored by Leonard, purported to support Kinsley's theory that A.K. was withholding information.

146.  At the conclusion of the A.K.'s interview, Knisley informed his parents that he was withholding information.

147.  Terrified and thinking that their child had been victimized, A.K.'s parents asked Knisley if they should seek counseling for their child.  Knisley replied in the negative telling the parents that this would just push the child further into a shell.  This left the parents with no choice but to return home and over the course of months question their child repeatedly, who never wavered from his initial statements contradicting the accuser's story.

148. Kinsley's advice to these parents is contrary to commonly accepted psychological practice.

149.  On April 28th, 2023, at the request of the investigators, the accuser presented to Dayton Children's Hospital for a rape examination.  The accuser declined the examination.

150.  Plaintiff was arrested May 2nd, 2023 at his home.  He was double handcuffed and taken to jail without shirt or shoes.

151.  A video of Plaintiff 's shirtless arrest was immediately released to the media by the West Milton Police Department and its Defendant employees.

152. The video of Plaintiff 's arrest was repeatedly shown by local state, and national news media outlets hundreds of times.

153. The video of Leonard and the Brewers discussing the lack of evidence against plaintiff and the plan to arrest plaintiff without probable cause was never released by West Milton officials.

154. Plaintiff spent over a month incarcerated before posting bond.

155. In order to post bond Plaintiff and his family had to put up multiple homes as collateral and pay over thirty thousand dollars in costs.

156. An indictment against Plaintiff was issued May 3rd, 2023 one day after his arrest.

157. A.K., the only eye witness, was not summoned to testify before the grand jury.

158. After the arrest was made public, Defendant Brewers began a Face Book group called "Milton Moms", which, at one time had a membership exceeding four hundred members.

159. Defendant Brewers used this public platform to make various written false and defamatory statements knowingly, maliciously and/or with reckless disregarded for their falsity, about Plaintiff and the West Milton School District.

160. The public statements made by the Brewers were conducted in order to further Plaintiff's malicious prosecution.

161. The day the media reported the accusations were fabricated, Defendant Brewers deleted the Milton Moms Face Book group.

162. Upon the arrest of Plaintiff, Defendants Stevens, Leonard, Wright and City of West Milton published the unsubstantiated allegations through the West Milton's Police Departments Face Book page asking for others to come forward with additional

information.  No one ever came forward and the Defendants never removed this public posting.  It remains up as of the time of this filing.

163.  Defendants knew that, despite having a lack of probable cause, Plaintiff's arrest would be disseminated publicly and such publication would contain negative and inflammatory allegations against Plaintiff.

164.  Defendants Wright, Leonard and Stevens knowingly, maliciously and/or with reckless disregarded for their falsity, incorporated statements into their report which they knew would cause Plaintiff shame and ridicule.

165.  All Defendants have orally repeated these defamatory allegations.

166.  In the fall of 2023, after filing a civil lawsuit against Plaintiff and the West Milton School District, the Brewers helped organize public protests in front of the West Milton School during School Board meetings.

167.  The protests were conducted in order to further Plaintiff's malicious prosecution.

168.  During one of these protests, B.B. informed other students that he had told his mother he made the allegations up.

169.  In January of 2024, B.B. confirmed to the prosecutors that his mother had been told previously of the fabrications.

170.  When confronted Mrs. Brewer denied B.B. had recanted, despite his own confirmation that he had.

171.  The actions of the Defendants at all times were wanton, willful, reckless, in bad faith and a knowing violation of the Plaintiffs' rights.

172.  The actions of the Defendants have caused Plaintiff physical and psychological injury, loss of liberty, humiliation, stress, as well as reputational and financial damage.

## CLAIMS FOR RELIEF

### 1. Violation Of Civil Rights Under the Fourth and Fourteenth Amendments

173.  The actions of Defendants Leonard, Stevens, Wright and Knisley violated Plaintiff 's rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unlawful arrest and malicious prosecution.

174.  The actions of these Defendants caused Plaintiff to be denied his due process rights under the United States Constitution.

175.  The actions of these Defendants caused Plaintiff to be prosecuted without probable cause, which directly caused him to be deprived of his liberty.

176.  Plaintiff has been damaged as pled herein.

### 2. State Causes of Action

177.  The actions of the Defendants Leonard, Stevens, Wright and Knisley constitute the torts of false arrest, false imprisonment, malicious prosecution and intentional infliction of emotional distress under the laws of the State of Ohio.

178.  The actions of the Defendants Leonard, Stevens, Wright and the Brewers constitute the torts of libel, slander, and intentional infliction of emotional distress under the laws of the State of Ohio.

### 3. Conspiracy

179.   The actions of all Defendants constitute a conspiracy to falsely arrest, maliciously prosecute and deprive Plaintiff of his constitutional rights in violation of § 42 U.S.C.  1983 and state law.

### 4. Village of West Milton

180.  The violation of Plaintiff's constitutional rights as pled herein and Plaintiff's resulting damage therefrom, along with the conduct of Defendants Leonard, Stevens, Wright and Knisley were directly and proximately caused by  the actions and/or inactions of the Village of West Milton which encouraged, tolerated and/or were deliberately indifferent to the following polices, and practices and customs and need for training and/or the need for more or differing training , supervision and oversight in the areas of:

The legal basis  to arrest and criminally charge an individual; the proper exercise of police power; the proper handling of a child sexual abuse allegations; the proper techniques to be employed during a forensic interview of a child accuser, including when to and when not to employ non forensic techniques; proper police procedure for interviewing juvenile witnesses to a crime, including when to and when not to employ non forensic techniques; proper disclosure of exculpatory material to the prosecution; a police officer's use of their status as police officers to conduct personal favors which contravene their policing duties; the practice of unlawfully arresting individuals so that such an arrest may uncover evidence in support thereof after the fact; failing to supervise and/or take corrective actions for said failures; proper and factual reporting of investigative activities and officer's subsequent obligations in communicating that information to those charged with the decision to bring criminal charges; and the institution of criminal charges under the circumstances presented by this case.

### 5. Criminal Conduct

181.  The actions of Defendants Leonard, Stevens, Wright and Knisley violated Ohio Revised Code Section 2921.45, which states: (A) No public servant, under color of the

public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right.

182. A violation of Section 2921.45 is a misdemeanor of the first degree.

183. Plaintiff is entitled to recovery for said violation pursuant to Ohio Revised Code Section 2307.60.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff ask for judgment against the Defendants and requests compensatory and punitive damages in an amount to be determined at trial; the costs of this action, including reasonable attorney's fees; and any other relief the Court deems appropriate.

Respectfully submitted,


**s/ Anthony Comunale**

_____
**ANTHONY COMUNALE (0062449)**
**Attorney(s) for Plaintiff**
130 West Second Street
Suite 1444
Dayton, Ohio 45402-1504
(937) 227-3310


**s/ Jason Nye**

_____
**JASON NYE (0098615)**
**Co-Counsel Attorney(s) for Plaintiff**
130 West Second Street
Suite 1444
Dayton, Ohio 45402-1504
(937) 227-3474

## JURY DEMAND

The Plaintiffs hereby demand a jury to determine all issues triable by jury in this matter.

**s/ Anthony Comunale**
_____
**ANTHONY COMUNALE (0062449)**
**Attorney for Plaintiff**