**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| JERRY NORTH *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 3:24-cv-137 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| VILLAGE OF WEST MILTON *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

---

**ENTRY AND ORDER GRANTING DEFENDANT JENNIFER KNISLEY'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 45)**

---

Presently before the Court is Defendant Jennifer Knisley's ("Defendant Knisley") Motion for Summary Judgment (Doc. No. 45). In brief, Plaintiff Jerry North ("Plaintiff") filed the instant action, alleging Defendant Knisley took part in a larger conspiracy—along with the Village of West Milton ("Defendant West Milton"), Doyle Wright ("Defendant Wright"), James Leonard ("Defendant Leonard"), Jason Stevens ("Defendant Stevens"), Angela Brewer ("Defendant Angela"), and Michael Brewer ("Defendant Michael") (collectively, the "Defendants") to falsely accuse and subsequently prosecute Plaintiff for sexual assault of a child. (Doc. No. 3 at PageID 30.) Plaintiff's Complaint seeks relief pursuant to 42 U.S.C. § 1983, for alleged violations of Plaintiff's Fourth and Fourteenth Amendment rights. (*Id*. at PageID 52–54.) In addition, Plaintiff raises violations of rights afforded to him by Ohio civil and criminal law. (*Id*.) Defendant Knisley's role in the purported conspiracy is limited to her involvement as a social worker in conducting the forensic interviews of the alleged victim, B.B., and another child-witness, A.K. (*Id*. at PageID 32.) By her Motion, Defendant Knisley seeks summary judgment and dismissal with prejudice of all

claims against her. (Doc. No. 45 at PageID 445.) For reasons stated below, the Court **GRANTS** Defendant Knisley's Motion (Doc. No. 45) in its entirety and consequently **DISMISSES** all claims as they pertain to Defendant Knisley in this action.

## I. BACKGROUND

The facts of this case are relatively straightforward and undisputed. On May 2, 2023, Plaintiff was accused by B.B.—then, an 11-year-old boy—of sexual assault, which, according to B.B.'s original accusation, occurred a few years prior over the course of a three-year timeframe. (Doc. No. 3 at PageID 33.) At the time of the alleged assault, Plaintiff was employed as a custodian at the West Milton School District, where B.B. was enrolled as a student. (*Id*. at PageID 31–32.) Per his accusation, B.B. had been "inappropriately touched at school by Plaintiff in the school's restroom and that Plaintiff was luring students into the restroom with offers of candy." (*Id*. at PageID 36.) B.B. further reported that his classmate, A.K., witnessed the abuse on multiple occasions and reported it to his own mother, who also happened to work at the school. (*Id*. at PageID 41–42.) However, no action was taken until years later when B.B. notified his mother of the alleged abuse. (*Id*. at PageID 33.) Upon B.B.'s admission, B.B.'s mother reported the incident to the West Milton Police Department, which launched an investigation into B.B.'s allegations. (*Id*. at PageID 36.) While Plaintiff avers that there is a litany of reasons the investigation was lackluster, only a few are relevant to Defendant Knisley's involvement. In broad strokes, Plaintiff believes Defendants lacked probable cause to arrest him based on the purportedly meager evidence gleaned during the investigation. (*Id*. at PageID 33.) According to Plaintiff, Defendant Knisley's forensic interviews of B.B., the accuser, and A.K., the child-witness, were both deficient and formed the lynchpin of the inculpatory evidence later provided to the grand jury and resulting in Plaintiff's indictment. (*Id*. at PageID 45.)

Defendant Knisley is a licensed social worker and the founding program director of the Child Advocacy Center (the "CAC") for a non-profit organization called Isaiah's Place. (Doc. No. 46-2 at PageID 774–75.) In 2005, after becoming a licensed social worker, Defendant Knisley began conducting child forensic interviews with various entities throughout her years of practice and eventually established the CAC at Isaiah's Place in around 2022. (*Id*. at PageID 776, 825.) During the CAC's formation, Defendant Knisley coordinated with various agencies, including several local police departments—referred to as a Multidisciplinary Team ("MDT")—in order to offer her forensic interviewing services and coordinate any future investigatory efforts. (*Id*. at PageID 783.) The purpose of the MDT was to facilitate cooperation among various agencies, such as the CAC, Child Protective Servies ("CPS"), and police departments, in the event that an investigation required a child forensic interview. (*Id*.) The services offered by the CAC include "forensic interviewing, connection to resources, referrals for medical exams, referral for mental health treatment" and various types of training. (*Id*.) In January of 2023, the CAC entered into an agreement with the West Milton Police Department (the "Police Department") whereby the CAC agreed to provide the abovementioned services "and such services as necessary to be able to complete an investigation." (*Id*. at PageID 874–75.)

Following the alleged incident at issue, B.B. was referred to the CAC for a forensic interview. (*Id*. at PageID 800.) Just prior to B.B.'s interview, Defendant Knisley met with CPS agents and officers from the Police Department to gain a general overview of the nature of the allegations. (*Id*. at PageID 801.) During the interview, Defendant Knisley questioned B.B. alone in a room, while Defendant Stevens, a CPS agent, and B.B.'s grandmother observed from an adjacent room. (Doc. No. 58 at PageID 2998.) When questioned, B.B. recounted numerous instances of sexual assault—some witnessed by A.K. and others not—at the hands of Plaintiff.

(*See generally id.*) Defendant's Knisley's objective in conducting such interviews was to "gather information" for law enforcement to subsequently use in criminal investigations, if any. (Doc. No. 46-2 at PageID 814.) Towards the end of her interview with B.B., Defendant Knisley took a brief break, at which time she met with members of the MDT. (*Id*. at PageID 803.) Following the B.B. interview and in accordance with common CAC procedure, an unedited version of Defendant Knisley's interview with B.B. was provided to the Police Department and, later, the prosecutor's office. (Doc. Nos. 46-5 at PageID 1424; 46-2 at PageID 796.)

In addition to her interview with B.B., Defendant Knisley conducted a forensic interview of A.K., the purported child-witness. (*See generally* Doc. No. 59.) And as with B.B.'s interview, members of the MDT, including law enforcement, observed the interview from an adjacent room. (*Id*. at PageID 3105.) Although A.K. expressed the sentiment that he thought Plaintiff was generally "weird," A.K.'s account told an entirely different story than B.B.'s. (*Id*. at PageID 3135, 3138, 3142.) But when asked if Plaintiff solicited or inappropriately touched either himself or B.B., A.K. informed Defendant Knisley that he "[didn't] think [Plaintiff's] ever done that to anybody[,]" and even if he had, A.K. must have "completely zoned it out." (*Id*. at PageID 3166–67.) As with B.B.'s interview, Defendant Knisley took a short break and spoke with members of the MDT. (Doc. No. 46-2 at PageID 815.) Similarly, at the conclusion of the interview, Defendant Knisley handed over a DVD copy of A.K.'s forensic interview to law enforcement. (*Id*. at PageID 796.)

Following these interviews and additional police investigation, a grand jury returned an indictment against Plaintiff for three counts of rape; two counts of gross sexual imposition; and one count of intimidation of an attorney, victim, or witness in the Court of Common Pleas in Miami County, Ohio (the "Criminal Case").[1] (*See* Miami County Court of Common Pleas, Case No.

[1] The Court takes judicial notice of the filings docketed in Plaintiff's criminal case, Case Number 23CR179 in the Court of Common Pleas in Miami County, Ohio. *See Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999) ("It is

23CR179, Indictment at Pages 1–2.) Plaintiff was arrested on May 4, 2023. (Criminal Case, Executed Warrant at Page 2.) Shortly before the trial in the Criminal Case was set to commence, B.B. "admitted to fabricating the vast majority of his allegations[,]" so the prosecution moved to dismiss Plaintiff's indictment. (Criminal Case, Motion to Dismiss at Page 1.) Accordingly, the common pleas judge dismissed Plaintiff's indictment with prejudice. (Criminal Case, Dismissal Entry at Page 1.) And so incepted the present case, when Plaintiff filed suit in this Court on May 1, 2024. (*See* Doc. No. 1.) Following extensive discovery, Defendant Knisley filed her Motion for Summary Judgment on February 18, 2026 (Doc. No. 45). Plaintiff responded on May 12, 2026 (Doc. No. 53), and Defendant Knisley replied on May 26, 2026 (Doc. No. 57). Consequently, Defendant Knisley's Motion is ripe for review and decision.

## II. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, affidavits or sworn declarations, and admissions on file, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(a), (c).

The burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256

---

well-settled that federal courts may take judicial notice of proceedings in other courts of record . . . ." (quotation marks, citations, and alterations omitted)).

(1986). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Id*. at 248–49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e). Additionally, "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id*. at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id*. The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a

verdict. *Id*. District courts are also at liberty to decide pure questions of law on motions for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).

## III. ANALYSIS

As mentioned, Plaintiff's Complaint raises constitutional claims pursuant to 42 U.S.C. § 1983, as well as Ohio state law claims. (Doc. No. 3 at PageID 52–54.) According to Plaintiff, Defendants, including Defendant Knisley, violated his Fourth and Fourteenth Amendment rights when they unlawfully arrested him without probable cause and maliciously prosecuted him based on insufficient evidence. (*Id*. at PageID 52.) The Court begins its analysis by addressing Plaintiff's Section 1983 claims, first determining whether Defendant Knisley sufficiently qualifies as a state actor to afford Plaintiff the right to bring Section 1983 claims against her.

### A. State Actor[2]

Defendant Knisley argues that the mere fact that "West Milton Police Department was included in the MDT and paid [Defendant] Knisley's employer, Isaiah's Place, a fee for her to conduct the two child interviews is not enough to transform [Defendant] Knisley into a 'state actor.'" (Doc. No. 45 at PageID 452.) Further, Defendant Knisley states that there is "no evidence of any joint action between [Defendant] Knisley and the West Milton Police Department," and upon completion of the interview of both the child-accuser and child-witness, "[Defendant] Knisley's involvement ended and she was not involved in the criminal investigation." (*Id*. at PageID 453.) Plaintiff, meanwhile, believes that because Defendant Knisley's "interviews would have otherwise been conducted by the police[,]" she qualifies as a state actor for Section 1983 purposes. (Doc. No. 55 at PageID 2832.) Plaintiff further avers Defendant Knisley's entanglement

[2] The Court extends its sincerest gratitude to its judicial extern, Jonathan Huelsman, for his invaluable assistance in this matter.

with MDT members, including law enforcement, and overall involvement in the investigation begetting Plaintiff's Criminal Case justify her classification as a state actor.

Section 1983 provides, in relevant part:

> Every person who, *under the color of any statute*, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphasis added). To state a cause of action under 42 U.S.C. § 1983, two elements are required. The plaintiff must show that the defendant "acted under color of state law and that their actions caused the violation of a federal right." *Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 612 (6th Cir. 2018). Private actors' conduct may be properly considered state action under limited circumstances. *See id.* The Sixth Circuit "has identified three tests to resolve the state-actor inquiry: the public-function test, the state-compulsion test, and the nexus test." *Carl v. Muskegon County*, 763 F.3d 592, 595 (6th Cir. 2014). Because Defendant Knisley is a private party and not a government employee, Plaintiff's Section 1983 claims will turn on whether or not he has shown that Defendant Knisley acted under color of state law.

**i. The Public-Function Test**

Plaintiff has not shown that Defendant Knisley is a state actor under the public-function test. A private party is a state actor under the public function test "if [he or she] exercises powers traditionally reserved exclusively to the state." *Reguli v. Guffee*, 371 Fed. App'x 590, 600 (6th Cir. 2010) (citing *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003)). "The public function test has been interpreted narrowly. Only functions like holding elections, exercising eminent domain, and operating a company-owned town, fall under this category of state action." *Id.* (citations omitted). The court must conduct "a historical analysis to determine whether the party

has engaged in an action traditionally reserved to the state, and the plaintiff bears the burden of making that showing." *Id.* (quoting *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003)).

While it may be true that governments have performed forensic interviews in the past, forensic interviews "have not been exclusively within the power of the state." *Molnar v. Care House*, 574 F. Supp. 2d 772, 784 (E.D. Mich. 2008). Many different groups, including social workers, conduct forensic interviews with children; moreover, "providing counseling services," like those supplied by Defendant Knisley here, "is not a power reserved exclusively to the state." *Reguli*, 371 Fed. App'x at 600. Further, the fact that Isaiah's Place receives a large portion of its funding from the state and receives client referrals from state agencies does not necessarily transform it into a state actor. *See Rendel-Baker v. Kohn*, 457 U.S. 839, 840–42 (1982) (rejecting an argument that a private non-profit organization was a state actor because it received public funding or because it was under regulations or contracts with the state, because there was no evidence that the discharge of petitioners was "compelled or even influenced by any state regulation"). Moreover, Plaintiff has made no historical argument to enable this Court to find that such forensic interviews are "traditionally reserved to the state," and has thus not carried his burden. *Reguli*, 371 Fed. App'x at 600. Thus, Defendant Knisley is not a state actor under the public-function test.

**ii. The State-Compulsion Test**

Next, Defendant Knisley is not a state actor under the state-compulsion test. Under the state-compulsion test, "a state [must] 'exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state.'" *Reguli*, 371 Fed. App'x at 600 (quoting *Lansing v. City of Memphis*, 202 F.3d

821, 829 (6th Cir. 2000)). "[T]o support such a theory, a plaintiff must allege and prove that state officials coerced or participated in the [defendant's] decision-making to the extent required to trigger state actor status." *Wilcher v. City of Akron*, 498 F.3d 516, 520 (6th Cir. 2007).

No evidence in the record demonstrates that Defendant Knisley was coerced by the state in the process of providing her services, nor that the state participated in her decision-making process. While it is true that Defendant Knisley offered her services to the Police Department and the prosecutor's office, the state had no control over Defendant Knisley's actions in conducting the interview. At no point did the officers provide Defendant Knisley with any sort of script of questions that they wanted her to ask in the interviews. (Doc. No. 46-4 at PageID 1177.) And when asked what role law enforcement generally plays in the forensic interview process, Defendant Knisley indicated that their involvement is minimal: "They're there and they watch. They may have feedback at the break. Whether or not I choose to use it is up to me." (Doc. No. 46-2 at PageID 797.) In fact, Defendant Knisley even rejected the Police Department's suggested questions during the break of A.K's interview, as it would have been improper in the child forensic interview context:

> [S]he stepped out to speak with all us in the observation room—meaning myself [Defendant Leonard] and [Defendant] Stevens, and I believe the Victim Witness was there as well. There was [sic] several people in that room for that particular interview . . . and [we] said that we thought he was holding back because he had some vague answers and memory lapses, weren't sure what that was, and his body language. And we discussed asking [Defendant Knisley] if she could maybe get into more detail about specifics, and she said she didn't feel comfortable doing that, necessarily, because it could close him down if she pushed too hard . . . if he was a trauma victim himself . . . .

(Doc. No. 46-3 at PageID 1064.) Instead, the record demonstrates that Defendant Knisley was retained to conduct forensic interviews and did so independently, without influence from the state. Thus, Defendant Knisley is not a state actor under the state-compulsion test, as there are no facts

present in the record that demonstrate that the state exercised coercive power or control over Defendant Knisley's actions.

**iii. The Nexus Test**

Finally, Defendant Knisley is not a state actor under the nexus test. The nexus test provides that a private party's action is state action "when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the [private party] may be fairly treated as that of the state itself." *S.H.A.R.K. v. Metro Parks Serving Summit Co.*, 499 F.3d 553, 565 (6th Cir. 2007) (citation and quotation marks omitted); *Regulii*, 371 Fed. App'x at 601. The Supreme Court has explained that state action is present when there is pervasive entwinement between a private actor and the state. *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 291 (2001). However, "there is no 'readily applicable formula' for finding such a close nexus; divining such a close relationship can only be accomplished 'in the framework of the peculiar facts or circumstances present.'" *Wilcher*, 498 F.3d at 520 (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 726 (1961)).

Two cases illustrate the analysis undertaken in determining what qualifies as state action under the nexus test in a situation like the present case. *See Molnar*, 574 F. Supp. 2d at 785–86; *Gokor v. Schlievert*, 335 F. Supp. 3d 972, 982–84 (N.D. Ohio 2018). *Molnar* demonstrates circumstances where state action is not found under the nexus test. *Molnar*, 575 F. Supp. 2d at 785–86. In *Molnar*, the plaintiff brought a Section 1983 action against multiple defendants after he was found not guilty of criminal sexual conduct towards his daughter. *Id.* at 780–81. Of these defendants were Care House and a Care House employee, Amy Allen, who conducted a forensic interview with the plaintiff's daughter after the plaintiff's ex-wife reported the conduct to the police department. *Id.* at 779. In ruling on a motion for summary judgment, the court found that

the Care House defendants were not state actors. *Id.* at 782–86. The court there explained that "although the . . . police referred [the child] to Care House, there is no evidence of record suggesting that the police or the prosecutor's office supervised, directed or otherwise participated in her interview." *Id.* at 785–86. The court explained further that even though authorities could observe the interview, "they did not participate in the questioning[,]" and once the interview had concluded, the defendant and Care House's role had ended as well. *Id.* at 785–86; *see also Reguli*, 371 Fed. App'x at 601–02 (affirming a grant of summary judgment and stating that defendant was not a state actor under the nexus test, in part, because "[t]he state had no role in how [defendant] conducted his evaluations . . . .").

In contrast, *Gokor* demonstrates circumstances where a defendant may be a state actor under the nexus test. *Gokor*, 335 F. Supp. 3d at 894. In *Gokor*, the plaintiff brought a Section 1983 action against the defendant, Dr. Schlievert, who "contract[ed] with Children Services to evaluate possible child-abuse cases" and concluded that a child's injury, who was under the care of the plaintiff at the time, was "non-accidental." *Id.* at 975. The plaintiff brought suit after the prosecutor's office dismissed charges against her because an expert debunked the defendant's report. *Id.* The plaintiff claimed that the defendant "violated her Fourth Amendment rights by preparing and submitting to law-enforcement authorities a false, fabricated, and materially misleading report implicating her in [the child's] supposedly 'non-accidental' injury." *Id.* at 979. After determining that the defendant was not a state actor under the public-function test, the *Gokor* court turned to the nexus test. *Id.* at 981–82. In determining that the plaintiff had "sufficiently and plausibly alleged 'a sufficiently close nexus' between the State's handling of child-abuse investigations and [defendant's] forensic examinations," the court emphasized that the defendant was examining the children, reviewing their medical records and other documents, and, most

notably, forming an opinion about their injuries. *Id.* at 982. Further, the court explained that the defendant "creates the report . . . knowing that police and prosecutors will share the reports among themselves and rely on them to make decisions about whom to arrest and what charges to bring." *Id.* at 983. Importantly, this case distinguishes *Molnar* in stating that the defendant "did not simply question an abuse victim about his injuries and let authorities draw their own conclusions; he drew the conclusions, put them in a report . . . , and sent them" to the police and children services "who had previously admitted that [defendant's] opinion would determine the outcome of their investigation . . . ." *Id.* at 984.

In the case at hand, the record demonstrates that, similar to *Molnar*, Defendant Knisley is not a state actor because there are no facts that demonstrate a sufficiently close nexus between the state and Defendant Knisley's actions such that there is pervasive entwinement. As in *Molnar*, the children were referred to Defendant Knisley for forensic interviews, Defendant Knisley performed the interviews alone, and law enforcement did not direct the kinds of questions Defendant Knisley was to ask during the interviews of B.B. and A.K. (Doc. No. 46-2 at PageID 801–02.) While the police officers and other members of the MDT were present at the interview, they watched from another room and did not participate in the questioning at all. (*Id.* at 797–98.) As emphasized above, when one of the officers requested that Defendant Knisley ask further questions to go into more detail during one of the interviews, she refused, citing their impropriety in the context of child forensic interviews. (Doc. No. 46-3 at PageID 1064.) Importantly, unlike *Gokor*, once the interviews were over, Defendant Knisley submitted the recordings to the Police Department and had no further involvement. (*Id.* at PageID 1082.) Whereas the defendant in *Gokor* submitted a report to the officers with his conclusions, with knowledge that his conclusions would determine the outcome of the investigation, Defendant Knisley drew no conclusions and did not submit a

report to the police with findings. (*Id.*; Doc. No. 46-2 at PageID 795.) In fact, Defendant Knisley's role was not to draw any conclusions; rather, her role was simply to gather information. (Doc. No. 46-2 at PageID 795.) Further, once Defendant Knisley submitted the videos, her role in the matter had ended. (Doc. No. 46-3 at PageID 1082.) It was then up to the police and the prosecutor's office to undergo further investigation and determine whether or not to bring charges against Plaintiff. (*Id.*; Doc. No. 46-2 at PageID 795.)

Thus, based on the record in this case, Defendant Knisley is not a state actor under the nexus test, as there are no facts that demonstrate that there is a sufficiently close nexus between the state and Defendant Knisley's actions. Therefore, because Defendant Knisley does not qualify as a state actor under the public-function, the state-compulsion, or the nexus tests, Defendant Knisley will not be considered a state actor in this matter. And because she is not a state actor, she cannot be sued under Section 1983. *See Goodell v. Malkin*, No. 20-1862, 2021 WL 4050629, at *2 (6th Cir. July 26, 2021). Accordingly, the Court **GRANTS** Defendant Knisley's Motion for Summary Judgement (Doc. No. 45) as it pertains to Plaintiff's Section 1983 claims.

### B. State Law Claims

Next, the Court tackles Plaintiff's Ohio state law claims. Plaintiff's Complaint charges Defendant Knisley with the torts of false imprisonment, false arrest, malicious prosecution, and intentional infliction of emotional distress under the civil laws of the State of Ohio. (Doc. No. 3 at PageID 52.) In addition, Plaintiff alleges Defendant Knisley is liable for conspiracy for her dealings with her co-defendants in the commission of the above torts. (*Id.*) The Court addresses the causes of action in succession.

### i. **False Imprisonment and False Arrest**

"[F]alse imprisonment occurs when a person confines another intentionally without lawful privilege and against his consent within a limited area for any appreciable time, however short." *Logsdon v. Hains*, 492 F.3d 334, 347 (6th Cir. 2007) (citation, quotation marks, and alterations omitted). Similarly, "the essential elements for a false arrest claim in Ohio are indistinguishable from a claim for false imprisonment in that each claim requires proof that one was intentionally confined . . . without lawful justification." *Id*. (citation, quotation marks, and alterations omitted). It is axiomatic that a defendant who does not imprison or arrest a plaintiff may not be held liable for said torts. *See Day v. DeLong*, 358 F. Supp. 3d 687, 709 (S.D. Ohio 2019) ("False arrest is not a continuing tort, thus, any Defendants who did not arrest Plaintiff, cannot be held liable for false arrest."); *Rennick v. Provident Bank*, No. 1:06-CV-820, 2008 WL 696893, at *9 (S.D. Ohio Mar. 12, 2008) ("Plaintiff can not assert a false imprisonment claim against a party who did not intentionally confine him. The false imprisonment claim can only be asserted against the actual person who confined Plaintiff.").

Here, there exists no question that Defendant Knisley took no part in Plaintiff's arrest. As mentioned, after concluding her forensic interviews of B.B. and A.K., Defendant Knisley's involvement terminated. (Doc. No. 46-3 at PageID 1082.) In fact, Defendant Knisley only became apprised of Plaintiff's arrest and B.B.'s subsequent recantation when she saw it on the news. (Doc. No. 46-2 at PageID 832.) Having played no role in Plaintiff's confinement or arrest, Defendant Knisley cannot be held liable for the torts of false imprisonment or false arrest. Accordingly, the Court **GRANTS** Defendant Knisley's Motion for Summary Judgment (Doc. No. 45) as it pertains to those claims.

### ii. Malicious Prosecution

"[T]o succeed on a claim of malicious criminal prosecution, an Ohio claimant must show three elements: (1) malice in instituting or continuing prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Logsdon*, 492 F.3d at 347 (citation, quotation marks, and alterations omitted).

For this claim, Plaintiff stumbles at the first hurdle. Per her deposition testimony, although Defendant Knisley understood that prosecutors may potentially rely on her forensic interviews of B.B. and A.K. and potentially use them in initiating prosecution of Plaintiff, she "did not conduct the interview with the intention of eliciting some kind of accusation from [B.B.,]" nor did she participate in the decision to press charges against Plaintiff whatsoever. (Doc. No. 46-2 at PageID 836.) For that reason, Plaintiff's malicious prosecution claim against Defendant Knisley does not pass muster, and the Court therefore **GRANTS** Defendant Knisley's Motion for Summary Judgment (Doc. No. 45) as to Plaintiff's malicious prosecution claim.

### iii. Intentional Infliction of Emotional Distress

In Ohio, a defendant is only liable for intentional infliction of emotional distress (IIED) if she, "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress" to the plaintiff. *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130 (6th Cir. 1995). To state a cognizable IIED claim, a plaintiff must prove the following elements:

> 1) the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;
> 2) the conduct was so outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community[;]
> 3) the actions were the proximate cause of plaintiff's psychic injury; and
> 4) the mental anguish suffered by plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Walsh v. Erie Cnty. Dep't of Job & Fam. Servs.*, 240 F. Supp. 2d 731, 766 (N.D. Ohio 2003) (citation omitted).

The Court has no doubt that being falsely accused of sexual assault and having to endure the accompanying criminal prosecution process is quite distressing. However, accounting only for Defendant Knisley's conduct, it can hardly be said that Defendant Knisley engaged in extreme, outrageous or emotionally distressing conduct in conducting impartial forensic interviews, offering no opinion as to criminal culpability, and terminating any involvement in the matter once the interviews had concluded. Thus, Plaintiff's IIED claim necessarily fails, and the Court therefore **GRANTS** Defendant Knisley's Motion for Summary Judgment (Doc. No. 45) as to that claim.

**iv. Civil Conspiracy**

"The elements of the Ohio tort of civil conspiracy are: (1) malicious combination of two or more persons; (2) causing injury to another person or property; and (3) the existence of an unlawful independent act from the conspiracy itself." *AGC Flat Glass N. Am. v. John*, No. 2:23-CV-1980, 2024 WL 1174209, at *3 (S.D. Ohio Mar. 19, 2024) (citation and quotation marks omitted). For the same reason Plaintiff's previous claims failed, so too does his civil conspiracy claim. Stated differently, Plaintiff has presented no evidence that Defendant Knisley conspired with or participated in Plaintiff's investigation, arrest, or prosecution. In fact, in his deposition, Plaintiff admits that he is not aware of Defendant Knisley's involvement in any of said matters. (*See* Doc. No. 46-1 at PageID 633–34.) And as delineated in the state actor section above, the CAC's contractual relationship with the Police Department, alone, is insufficient to prove that she conspired with law enforcement. Accordingly, the Court **GRANTS** Defendant Knisley's Motion for Summary Judgment (Doc. No. 45) as it relates to Plaintiff's state law conspiracy claim.

### C. Criminal Cause of Action

For his final claim, Plaintiff alleges Defendant Knisley, along with other Defendants, "violated Ohio Revised Code Section 2921.45, which states: (A) No public servant, under the color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right." (Doc. No. 3 at PageID 53–54.) Having found Defendant Knisley violated neither Plaintiff's constitutional rights nor his Ohio state law rights, the Court need not proceed any further. Accordingly, the Court **GRANTS** Defendant Knisley's Motion for Summary Judgment (Doc. No. 45) as to Plaintiff's final, criminal cause of action.

## IV. CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant Knisley's Motion for Summary Judgment (Doc. No. 45) in its entirety. The Court further **DISMISSES** all claims against Defendant Knisley **WITH PREJUDICE**. Finally, the Court **DIRECTS** the Clerk to terminate Defendant Knisley as a defendant in this action.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, September 30, 2026.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE